## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.**

KHOSROW JAVANZAD,

Plaintiff,

v.

O'MEARA FORD CENTER, INC.

Defendant.

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL
_____

Plaintiff Khosrow Javanzad, through his attorney, Diane S. King, of the law firm of King & Greisen , LLP, submits his Complaint and Jury Demand against Defendant O'Meara Ford Center, Inc. ("O'Meara") as follows:

### I. INTRODUCTION AND GENERAL ALLEGATIONS

1. This is a national origin (Iran), religion (Muslim), race (Persian), and sex discrimination and retaliation case.

2. Mr. Khosrow Javanzad was born in Iran, is of Iranian descent, and is Muslim.

3. O'Meara is a Ford dealership selling new and used vehicles.

4. Mr. Javanzad initially worked at O'Meara as a salesperson in 2014. He worked there until 2016, when he decided to move to Texas to pursue new business prospects.

5. In early 2018, Dennis Doiel (General Manager of all O'Meara dealerships) contacted Mr. Javanzad and asked him to return to work for O'Meara. Mr. Javanzad accepted the offer.

6. Mr. Javanzad met with early success and was praised by Doiel in manager meetings.

1

7. Unfortunately, his praise engendered resentment from other O'Meara managers.

8. Starting in approximately May of 2018, other managers started harassing Mr. Javanzad based on his race, ethnicity, and religion by, for example:

    - reassigning his team's sales to other teams, thus depriving Mr. Janvanzad of income,
    - making derogatory comments about Muslims and Iranians,
    - firing or reassigning Mr. Javanzad's employees,
    - undermining Mr. Javanzad's standing with his employees, and
    - intentionally ordering food for company lunches that Mr. Javanzad, as a Muslim, could not eat without violating his religious observance.

9. Doiel initially protected Mr. Javanzad, creating a temporary lull in the harassment.

10. However, in June of 2018, Doiel started making inappropriate sexual comments to Mr. Javanzad.

11. The following month, Doiel became more aggressive, asking Mr. Javanzad how he felt about gay people. Doiel then demanded sex from Mr. Javanzad. Mr. Javanzad refused Doiel's sexual advances.

12. Following Mr. Javanzad's refusal of Doiel's sexual advances, Doiel stopped protecting Mr. Javanzad, leading to the escalation of the harassment.

13. Eventually, on September 10th, 2018, Doiel terminated Javanzad's employment, ostensibly for "lack of production."

14. Accordingly, Mr. Javanzad asserts claims against O'Meara for religion (Muslim), national origin (Iran), race (Persian), and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and race (Persian) discrimination and retaliation in violation of 42 U.S.C. § 1981.

## II. JURISDICTION AND VENUE

15. Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e,et seq., and 42 U.S.C. §1981.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed

within the jurisdictional boundaries of the United States District Court for the District of Colorado.

17. All procedural prerequisites for filing this lawsuit have been met. Plaintiff timely filed a Charge of Discrimination alleging race discrimination, national origin discrimination, and retaliation against O'Meara with the Equal Employment Opportunity Commission ("EEOC") and subsequently requested a Notice of Right to Sue letter. The Parties entered into a tolling agreemend extending the ninety (90) days. This Complaint and Jury Demand is being timely filed.

18. Therefore, under 42 U.S.C. § 2000e-5(f)(l), Plaintiff has satisfied all procedural prerequisites for suing in federal court.

### III. PARTIES

19. Plaintiff Khosrow Javanzad is a Colorado resident and was a Colorado resident at all relevant times, including during the events described in this Complaint.

20. At all relevant times, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 2000e and, as a Persian Iranian Muslim, is protected by the dictates of Title VII, as amended, 42 U.S.C. § 2000e et seq and as an Iranian, is protected by the dictates of 42 U.S.C. § 1981.

21. Defendant O'Meara is a corporation, with a place of business in Colorado.

22. At all relevant times, Defendant has continuously been doing business in the State of Colorado, and has continuously had at least fifteen (15) employees.

23. At all relevant times. Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

### IV. GENERAL ALLEGATIONS

24. Mr. Javanzad was born in Iran and is Muslim.

25. Mr. Javanzad worked at O'Meara as a salesperson in 2014-2016. In 2016, Mr. Javanzad moved to Texas to pursue new business opportunities.

26. In early 2018, Mr. Janvanzad spoke to Doiel while visiting Colorado. Doiel praised Mr. Javanzad's salesmanship and invited him to return to O'Meara as a Closing Manager. When Mr. Javanzad expressed reluctance leave Texas, Doiel promised Mr. Javanzad a 4% commissions on his team's sales, a better rate than any other O'Meara sales manager commanded. Based on this promised pay, Mr. Javanzad finally agreed

3

and relocated his family to Colorado.

27. Mr. Javanzad started working for O'Meara as a Closing Manager on March 27, 2018. From the beginning, Mr. Javanzad's sales team was staffed with fewer salespeople than other teams. Other O'Meara sales teams had eight to ten (8-10) people, but in March 2018, Mr. Javanzad's had only seven (7) people.

28. Mr. Javanzad planned to recruit more salespeople to reach parity with other teams.

**Commission disputes caused other Closing Managers' hostility to Mr. Javanzad, eventually leading them to express overt racism and Islamophobia.**

29. By the late April of 2018, Mr. Javanzad's team achieved strong sales.

30. Doiel practiced a "motivation by competition" management style in which he deliberately pitted his managers against each other to increase their enthusiasm, and by the end of April 2018, he had begun incorporating Mr. Javanzad into that approach.

31. In manager meetings, Doiel held up Mr. Javanzad as an example of success, saying things like, *"Why can't you do it more like Khosrow?"*

32. Doiel's approach bred resentment among the other managers. At the end of April, Mr. Javanzad discovered that several sales closed solely by his sales team were being jointly credited to other managers' teams.

33. O'Meara routingely credited collaborative sales to both participating teams for commissions purposes. Mr. Javanzad was thus being deprived of part of his pay.

34. Mr. Javanzad complained to Ruben Chavez and Mark Cuthill, the other Closing Managers involved, but they brushed him off.

35. Mr. Javanzad finally told Doiel about the problem on or around May 15, 2018, and Doiel immediately replied, "That's wrong." Doiel intervened and reinstated the sole sales credit to Mr. Javanzad's team.

36. The next day, Chavez burst into Mr. Javanzad's sales team meeting. Addressing the whole room, Chavez said that *he* decided which teams got credit for sales. Chavez then looked straight at Mr. Javanzad and said that anyone who went over his head to complain would be fired.

37. Chavez's threat launched an extensive harassment campaign against Mr. Javanzad by other O'Meara managers, creating a hostile work environment based on Mr. Javanzad's national origin, religion, and race.

4

38. Chavez and Chad Yeknich (New Car Director) immediately began hurling racist and Islamophobic comments at Mr. Javanzad, often in front of other employees. For example, Chavez regularly called Mr. Javanzad a "camel jockey," told him to "go the fuck home," and repeated things Mr. Javanzad said in a slurred, derogatory version of his accent. Chavez also made loud comments about Middle Easterners and Muslims when Mr. Javanzad was nearby, saying things like, "they're all fucking terrorists."

39. Yeknich similarly remarked that "Muslims are all terrorists" and once told Mr. Javanzad that it was funny that Muslims thought pork was dirty when all Muslims are dirty. One of Mr. Javanzad's salesmen, Erwin Jara, "witness[ed] . . . discrimination at O'Meara [F]ord towards Khosrow" based on Mr. Javanzad's "culture and accent."

40. Food and Muslim dietary restrictions immediately became a harassment target. O'Meara managers sometimes ordered special lunches for all employees. After mid-May 2018, Yeknich began ensuring that every dish in these lunches contained pork. Yeknich and Chavez laughed while they watched Mr. Javanzad search the food for something he could eat.

41. Yeknich often taunted Mr. Javanzad during these lunches by calling out that "pork is good for you, makes you strong!"

42. In June 2018, other managers began pulling Mr. Javanzad's salespeople aside and telling them not to listen to Mr. Javanzad. Several different managers attempted to suborn Mr. Javanzad's team members this way, including Ruben Chavez, Justin Chavez, Yeknich, and Cuthill. Several of Mr. Javanzad's employees warned him about these deliberate attempts to undermine him, but they always asked him to keep their confidence.

**Chavez fired only Mr. Javanzad's (and not another manager's) employees for inappropriate behavior, then rehired them after Mr. Javanzad's termination.**

43. Chavez terminated Mr. Javanzad's employees for pretextual reasons. For example, in June 2018, an O'Meara customer overheard several salespeople using the "n" word – two working for Mr. Javanzad (Alfredo Ramirez and Isaiah Quinonez) and another working for Mark Cuthill. Chavez terminated Ramirez and Quinonez, Mr. Javanzad's salesment, but Cuthill's employee was not fired.

44. Ironically, O'Meara rehired both Ramirez and Quinonez <u>less than one week</u> after Mr. Javanzad's September 2018 termination.

**O'Meara's Human Resources watched silently while Mr. Javanzad was bullied; only Doiel intervened to stop the harassment.**

45. O'Meara's Human Resources employee Heather Kornman knew that Mr. Javanzad was being harassed.

46. At a lunch in June 2018, while Chavez and Yeknich jeered at Mr. Javanzad about Muslims being dirty and pork being good for him, Mr. Javanzad observed that Kornman was standing nearby.

47. Kornman looked upset, but when she saw that Mr. Javanzad had noticed her, she walked out of the room.

48. Believing that complaints to Kornman would be futile, Mr. Javanzad complained directly to Doiel about Chavez and Yeknich's treatment.

49. Mr. Javanzad complained to Doiel because Doiel's earlier interference reduced or slowed the harassment for several weeks.

50. However, by mid-July 2018 anti-Iranian and anti-Muslim animus were daily features of Mr. Javanzad's work environment.

**Doiel propositioned Mr. Javanzad for sex but turned on him after being rejected.**

51. Mr. Javanzad had relied on Doiel to ensure fair treatment at O'Meara, and initially his trust seemed justified.

52. Doiel expected a quid pro quo for helping Mr. Javanzad.

53. Starting in June 2018, Doiel began giving Mr. Javanzad exaggerated compliments, such as "you're so handsome" and "look at Mr. Handsome," and making gay sexual references, such as pointing to male customers and telling Mr. Javanzad, "I would do him."

54. Mr. Javanzad heard several comments suggesting that Doiel had sexual relationships with other male O'Meara employees, such as Chavez teasing Cuthill about his "husband Dennis [Doiel]."

55. On or around July 10, Mr. Javanzad notified Doiel that he would need time off to help his family relocate to Denver.

56. Doiel agreed, but then asked Mr. Javanzad what he thought about gay men. Mr. Javanzad said that he was uncomfortable with gay men and changed the subject.

6

57. Three days later, around July 13, Mr. Javanzad asked Doiel when it would be best for O'Meara to take the time off to help his family move.

58. Doiel replied that he could take off the first week of August, but in the meantime, Mr. Javanzad should "come to my house at night and fuck me in the butt."

59. Mr. Javanzad was shocked and immediately walked away.

60. After July 13, Doiel never helped Mr. Javanzad with any work problem, no matter how serious.

61. The other managers, especially Chavez and Yeknich, continued to harass Mr. Javanzad with vulgar and racist remarks.

62. The other managers' racist taunts and interference with Mr. Javanzad's employees and commissions escalated throughout July and August.

**Doiel's joined the harassment against Mr. Javanzad.**

63. Doiel soon joined their campaign to undercut Mr. Javanzad.

64. While Mr. Javanzad was away from work in early August 2018 to help his family move, Doiel promoted Mr. Javanzad's most productive employees (Luis Ballesteros and Lauren Hilger) to Sales Managers in their own right.

65. Doiel never consulted Mr. Javanzad or told him about the promotions.

66. Mr. Javanzad learned that his already short-staffed team was now even smaller – and that his pay was reduced as a result – from his own subordinates when he returned to work.

67. Doiel also terminated Erwin Jara, another of Mr. Javanzad's best team members, in August 2018, without informing Mr. Javanzad.

68. Doiel also engaged in discriminatory pay practices targeting Mr. Javanzad.

    a. From May to July 2018, Doiel asked Mr. Javanzad to help manage another sales team for more than six weeks
    b. Doiel promised Mr. Javanzad a percentage of that team's commissions during that time.
    c. However, Doiel ultimately refused to pay, even though Mr. Javanzad complained to him in August 2018.
    d. The Colorado Department of Labor (CDOL) investigated O'Meara and concluded that it wrongfully failed to pay Mr. Javanzad.

7

  e. On information and belief, no other Closing Manager was denied commissions in this fashion.

### O'Meara terminated Mr. Javanzad in September 2018 on false pretenses.

69. Mr. Javanzad continued earning substantial profits for O'Meara through August 2018.

70. Mr. Javanzad's final week was one of the most profitable weeks in his O'Meara tenure.

71. However, despite this record of success, which Doiel praised in past management meetings, Doiel fired Mr. Javanzad on September 10, 2018, ostensibly for "lack of production," barefly eight weeks after Mr. Javanzad rejected Doiel's sexual advances.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### RACE, NATIONAL ORIGIN AND RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII

72. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

73. During Mr. Javanzad's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against him with respect to the terms and conditions of his employment based on his race (Persian) and national origin (Iran).

74. The unlawful employment practices include, without limitation,
    - disparate treatment,
    - racial coments,
    - coaching of Mr. Javanzad's employees to undermine his leadership,
    - discharge or reassignment of Mr. Javanzad's employees,
    - reassignment of sales credit belonging to Mr. Javanzad's team, and
    - discharge
    
    because of Mr. Javanzad's race and national origin.

75. The effect of these practices deprived Mr. Javanzad of equal employment opportunities and otherwise adversely affected his employment status because of his race and national origin.

76. These unlawful employment practices were intentional.

8

77. The unlawful employment practices were done with malice or with reckless indifference to Mr. Javanzad's federally protected rights.

## SECOND CLAIM FOR RELIEF
## GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

78. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

79. During Mr. Javanzad's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against him with respect to the terms and conditions of his employment based on his gender.

80. The unlawful employment practices include, without limitation,
    - disparate treatment,
    - racial coments,
    - coaching of Mr. Javanzad's employees to undermine his leadership,
    - discharge or reassignment of Mr. Javanzad's employees,
    - reassignment of sales credit belonging to Mr. Javanzad's team, and
    - discharge

    because of Mr. Javanzad's gender.

81. The effect of these practices deprived Mr. Javanzad of equal employment opportunities and otherwise adversely affected his employment status because of gender.

82. These unlawful employment practices were intentional.

83. The unlawful employment practices were done with malice or with reckless indifference to Mr. Javanzad's federally protected rights.

## THIRD CLAIM FOR RELIEF
## RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII

84. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

85. During Mr. Javanzad's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against him with respect to the terms and conditions of his employment based on his religion (Muslim).

86. The unlawful employment practices include, without limitation,

- disparate treatment,
- coaching of Mr. Javanzad's employees to undermine his leadership,
- discharge or reassignment of Mr. Javanzad's employees,
- reassignment of sales credit belonging to Mr. Javanzad's team,
- religion-based comments such as "Muslims are dirty" or "pork is good for you,"
- exclusion from group lunches by deliberately ordering only the food that Mr. Javanzad couldn't eat due to his religious practice, and
- discharge because of Mr. Javanzad's religion (Muslim).

87. The effect of these practices deprived Mr. Javanzad of equal employment opportunities and otherwise adversely affected his employment status because of gender.

88. These unlawful employment practices were intentional.

89. The unlawful employment practices were done with malice or with reckless indifference to Mr. Javanzad's federally protected rights.

### FOURTH CLAIM FOR RELIEF
### RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY
### UNDER TITLE VII

90. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein,

91. Mr. Javanzad had a good faith belief that O'Meara was engaged in discriminatory conduct in violation of Title VII.

92. Mr. Javanzad engaged in protected opposition to Defendant's unlawful employment practices by complaining to Doiel about race, national origin, and religion-based discrimination by other O'Meara managers.

93. Mr. Javanzad engaged in protected opposition to Defendant's unlawful employment practices by refusing Doiel's sexual advances.

94. In retaliation for Mr. Javanzad's opposition to what he reasonably believed to be Defendant's unlawful race, national origin, religious, and gender discrimination against him, Defendant terminated his employment.

95. The effect of these practices deprived Mr. Javanzad of equal employment opportunities and otherwise adversely affected his employment status because of his national origin.

96. These unlawful employment practices were intentional.

97. The unlawful employment practices were done with malice or with reckless indifference to Mr. Javanzad's federally protected rights.

## FIFTH CLAIM FOR RELIEF
## DISCRIMINATORY TREATMENT BECAUSE OF RACE IN VIOLATION OF SECTION 1981

98. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

99. During Mr. Javanzad's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against him with respect to the terms and conditions of his employment based on his race (Persian).

100. The unlawful employment practices include, without limitation,
     - disparate treatment,
     - racial comments,
     - coaching of Mr. Javanzad's employees to undermine his leadership,
     - discharge or reassignment of Mr. Javanzad's employees,
     - reassignment of sales credit belonging to Mr. Javanzad's team, and
     - discharge
     
     because of Mr. Javanzad's race.

101. These practices deprived Mr. Javanzad of equal employment opportunities and otherwise adversely affected his employment status because of his race (Persian).

102. These unlawful employment practices were intentional.

103. The unlawful employment practices were done with malice or with reckless indifference to Mr. Javanzad's federally protected rights.

## SIXTH CLAIM FOR RELIEF
## RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY UNDER §1981

104. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

105. Mr. Javenzad had a good faith belief that O'Meara was engaged in discriminatory conduct in violation of § 1981.

106. Mr. Javanzad engaged in protected opposition to Defendant's unlawful employment

11

      practices by complaining about discrimination.

107. Mr. Javanzal complained to Doiel about race-based discrimination from other O'Meara managers.

108. In retaliation for Mr. Javanzad's opposition to what he reasonably believed to be Defendant's unlawful discrimination against him, Defendant terminated his employment.

109. These practices deprived Mr. Javanzad of equal employment opportunities and otherwise adversely affected his employment status because of his race.

110. These unlawful employment practices were intentional.

111. The unlawful employment practices were done with malice or with reckless indifference to Mr. Javanzad's federally protected rights.

**WHEREFORE,** Mr. Javanzad respectfully requests that the Court enter judgment in his favor and against Defendant, and award the following relief, to the fullest extent allowed by law:

    a. Back pay and related compensation, and front pay, in amounts to be determined at trial;
    b. Compensatory and consequential damages, as allowed;
    c. Emotional distress damages, as allowed;
    d. Punitive damages, as allowed;
    e. Injunctive and/or declaratory relief;
    f. Pre-judgment and post-judgment interest at the highest lawful rate;
    g. Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and
    h. Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 24th day of June, 2021.

                                      Respectfully submitted,

                                      *s/ Diane S. King*
                                      Diane S. King
                                      King & Greisen , LLP
                                      1670 York Street
                                      Denver, Colorado 80206
                                      (303) 298-9878 telephone

(303) 298-9879 facsimile
king@kinggreisen.com

*Attorney for Plaintiff*

Plaintiff's Mailing Address:

Khosrow Javanzad
12720 Dahlia Way
Thornton, CO 80241

13